UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| Idemia Identity & Security USA LLC, a Delaware limited liability company<br><br>       Plaintiff,<br>  v.<br><br>Joseph Migneco, an individual; and Biometrics4ALL, Inc., a California corporation,<br><br>       Defendants. | CASE NO.: |

## COMPLAINT

As and for its Complaint against Defendants Joseph Migneco ("Migneco"), an individual; and Biometrics4ALL, Inc. ("Biometrics"), Plaintiff Idemia Identity & Security USA LLC ("Idemia" or the "Company") states and alleges as follows:

## INTRODUCTION

1. Idemia brings this action against its former employee, Migneco, for breaching his Intellectual Property, Confidentiality & Noncompetition Agreement (the "Agreement"), and his new employer, Biometrics, for inducing that breach. Migneco managed and sold fingerprint enrollment services for the Company, and he promised not to work with competing companies for two years after leaving. In breach of the Agreement, when Migneco's employment with Idemia ended last year, he took a virtually identical position with Biometrics selling its fingerprint enrollment services in direct competition with Idemia. Idemia seeks a declaratory judgment, injunctive relief, and damages for Migneco's breach of the Agreement and Biometrics' tortious interference with the Agreement.

## PARTIES

2.  Plaintiff Idemia is a Delaware limited liability company with its principal place of business in Billerica, Massachusetts. Idemia is a wholly-owned subsidiary of Morpho USA, Inc, a Delaware corporation with a principal place of business in Austin, Texas. Idemia provides security and identity solutions and services worldwide, and Idemia's fingerprint enrollment services business unit is based in Franklin, Tennessee.

3.  Defendant Migneco is an individual residing, on information and belief, in Hilton Head, South Carolina. Migneco is a former employee of Idemia. Upon his separation of employment from Idemia, Migneco joined and is currently employed by Defendant Biometrics, a direct competitor of Idemia, in contravention of the Agreement. At all times during his employment with Idemia, Migneco reported to and was affiliated with the Idemia business unit located in Tennessee.

4.  Defendant Biometrics is a California corporation with its principal place of business in Irvine, California. Biometrics is a direct competitor of Idemia. Biometrics hired and continues to employ Migneco and, by doing so, it is tortuously and unlawfully interfering with the Agreement.

## JURISDICTION AND VENUE

5.  Because the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000 and is between citizens of different states, this Court has jurisdiction under 28 U.S.C. § 1332. Idemia is a citizen of Delaware and Texas. Migneco is a citizen of South Carolina. Biometrics is a citizen of California.

6.  This Court has personal jurisdiction over Migneco. Migneco worked for over eight years from Idemia's office in Tennessee, had consistent contact with the Idemia office in

Tennessee while employed with Idemia, and his actions giving rise to the claims asserted herein caused injury to Idemia in Franklin, Tennessee.

7. This Court has personal jurisdiction over Biometrics because, among other reasons, Biometrics maintains a service center in the State of Tennessee. Further, Biometrics maintains an interactive website that provides service, sales, and support in the State of Tennessee.

8. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Migneco worked for the Idemia business division located in Franklin, Tennessee, and Biometrics tortuously interfered with the contract between Idemia and Migneco, which injured Idemia in Franklin, Tennessee.

## BACKGROUND

### Idemia's Business

9. Idemia is a leader in security and identity solutions and services designed to simplify, protect, and secure the lives of people worldwide. Over the past decade Idemia went through a series of changes to its corporate structure as a result of mergers and acquisitions. As relevant here, Integrated Biometric Technology LLC ("IBT") was a wholly-owned subsidiary of L-1 Identity Solutions, Inc. ("L-1"), a corporation based in Connecticut and incorporated under the laws of the State of Delaware. In 2011, Safran S.A., a French corporation, acquired L-1 (and its various subsidiaries, including IBT). Safran subsequently merged L-1 with other U.S.-based subsidiaries of Safran in or about July of 2011. The surviving entity resulting from the merger was MorphoTrust USA, Inc. which was then converted into MorphoTrust USA, LLC in 2013. Morpho USA, Inc. (a Delaware corporation with its principal place of business in Texas) is the sole member of MorphoTrust USA, LLC. On or about December 20, 2016, Safran transferred 100% of the stock of Morpho USA, Inc. to Oberthur Technologies of America Corporation ("OT"),

3

and Morpho USA, Inc. is now a wholly-owned subsidiary of OT. MorphoTrust USA, LLC changed its name to Idemia Identity & Security USA LLC in 2017.

10. Idemia offers technologies, platforms, and services to assist its customers in enrolling, managing, and verifying biometric information primarily through fingerprinting. This process also includes the validation of official state and federal documents. It is the leading U.S. provider of identity solutions and services for driver license issuance, passports, border management, public safety, and applicant vetting. Idemia's customers include all fifty states, the District of Columbia, and numerous federal and local agencies. These agencies include the Federal Bureau of Investigation, the Department of Defense, the Department of State, the Transportation Security Administration, state departments of motor vehicles, border management agencies, and public safety and law enforcement agencies, as well as private entities involved in retail, finance, and employee/applicant vetting markets. Idemia has led – and continues to lead – its customers through significant transitions in its industry, including major innovations in secure ID issuance, biometrics, and enrollment services. Its technologies are continually recognized for superior accuracy and performance.

11. The division of Idemia directly relevant to this matter is the enrollment services business unit, which offers services for collecting fingerprint information ("Fingerprint Enrollment Services"). The enrollment services business unit provides Fingerprint Enrollment Services predominately to government agencies across the United States. Depending on the applicable law, Idemia contracts with one or more government agencies to provide such services. For example, a particular state may require one government agency to contract for all Fingerprint Enrollment Services required by that state's agencies (e.g., the department health, department of education, etc.). Idemia then enters into a contract with that agency to provide those services. Any individual

who needs to provide their fingerprint information would visit an Idemia enrollment center, where Idemia electronically collects the fingerprints, processes them, and then channels them to the appropriate authorities. There are only approximately five to seven companies that compete for such government Fingerprint Enrollment Services contracts in the U.S.

12. Governments may use several methods to decide with which biometric companies to contract. A typical method involves a state or agency issuing a Request for Proposal ("RFP"). In a RFP, the state or agency specifies the services they require, such as Fingerprint Enrollment Services, and any additional requirements for the contract (such as the number and location of enrollment centers). In response, each participating company submits a proposal indicating how the company will provide the Fingerprint Enrollment Services (including, for example, how many enrollment centers the company offers and which fingerprint devices and technology it will use). The government entity or agency selects a vendor based on various factors, including that company's technology platforms, pricing, and past performance. Alternatively, certain states are "open," meaning that the Fingerprint Enrollment Services are not contracted to a sole vendor by the state. Instead, various companies can set up enrollment centers and compete for business with the various government agencies in that state that require Fingerprint Enrollment Services.

13. All aspects of the Fingerprint Enrollment Services business are highly competitive, and those companies with the most advanced technology who can deliver the services in the most cost-efficient manner have a competitive advantage. Idemia devotes millions of dollars each year to researching and developing new technologies and delivery methods that perform better and are more cost-competitive. The new technologies and service-delivery platforms developed (and being developed) by Idemia are highly confidential and proprietary, giving Idemia a competitive advantage in the biometrics industry.

5

14. The success of businesses in this industry is also based on customer relationships and goodwill that have been developed by employees. Idemia's employees develop an understanding of its customers' businesses, including their unique needs and RFP processes. Employees who manage customers' programs act as liaisons between the customer and the Company, identifying operational and technological improvements based on their customers' needs. On behalf of the Company, Idemia employees develop goodwill by providing prompt solutions to issues that arise. This allows them to formulate and customize technologies, platforms, and solutions for specific customer applications. For example, in one "open" state, California, Idemia has developed a network of enrollment centers and worked to understand each state agency's needs so it can better respond to particular agencies' needs and requirements. This allows Idemia to position itself to deliver the Fingerprint Enrollment Services more effectively than its competitors in California. An employee's knowledge of any customer's current contract and Idemia's pricing structure provides a great deal of insight into how to best structure future contracts with that customer. For this reason, Idemia's underlying technologies, how it positions its solutions, knowledge of customer operations and applications, and the pricing models that Idemia has developed over the course many years are closely guarded secrets.

15. The Company has gone to great lengths to guard the secrecy of its confidential information. This information includes the Company's underlying technologies, how it positions its solutions, its customers, its pricing models and strategies, its customers' particular needs, the terms of the contracts with its customers, and other business information. In order to safeguard this information, Idemia requires all new employees to enter into a confidentiality and noncompetition agreement as a condition of employment. If an individual offered employment refuses to enter into that agreement, Idemia will not hire that individual. Similarly, the Company

6

has always maintained additional confidentiality policies with which all employees must comply. Finally, the Company requires third-parties to enter into non-disclosure agreements in order to access confidential information.

**Migneco's Employment with L-1, His Interaction with Customers, and His Knowledge of Confidential Information**

16. Migneco commenced employment with Idemia's predecessor, L-1, after almost a decade managing companies in the auto auction industry. L-1 extended an offer of employment as Vice President of Program Management on March 3, 2009. L-1 conditioned the offer of employment to Migneco on his execution of the Intellectual Property, Confidentiality, and Noncompetition Agreement (the "Agreement"). Among other things, the Agreement protects the trade secrets and confidential information entrusted to L-1's employees, such as pricing, customers, and business strategies, as well as its technology, platforms and solutions. The Agreement also protects the goodwill and relationships that employees cultivate with customers on behalf of L-1 by giving L-1 an opportunity to transition that customer after the employee (Migneco) leaves the Company.

17. Migneco accepted L-1's offer of employment and voluntarily signed the Agreement on March 9, 2009. A true and correct copy of the Agreement, executed by Migneco, is attached hereto as Exhibit A. Section (7) of the Agreement provides in relevant part:

> I acknowledge and agree that in the course of the Relationship, I will forge relationships with Company's customers and have access to significant Confidential Information and trade secret information belonging to Company. I further acknowledge and agree that Company's business is a highly specialized, technologically-advanced business with significant intellectual property serving a worldwide market. Accordingly, during the term of the Relationship and for two (2) years after expiration, termination or cessation of the Relationship for any reason whatsoever, I will not (unless otherwise approved in advance writing by the Chief Executive Officer of Company) become engaged by or act directly or indirectly on behalf of any other person, corporation or firm that competes directly or indirectly with Company in the business of biometrics, credentialing or ID

7

> management. For purposes of this Agreement, I agree that the term "business of biometrics, credentialing or ID management" includes the business of, without limitation, research, analysis, design, development, manufacture, license, sale, marketing, distribution, deployment or any other form of commercialization whatsoever, of concepts, ideas, technology, software, hardware or services related to identification cards, drivers licenses, facial, skin, fingerprint, palm, iris or other forms of biometric matching, verification or identification, in any case in respect of which I worked and/or became familiar with or exposed to during the Relationship.

The Agreement states that it is "governed by and construed in accordance with the laws of Connecticut."

18. As Vice President of Program Management, Migneco managed contracts with state agencies for Fingerprint Enrollment Services across the country. Migneco helped implement Idemia's technology and platforms with new customers, and he worked with existing customers to solve technical and other issues that arose. In this position, Migneco became intimately familiar with Idemia's technology and platforms by, for example, communicating with Idemia's engineers, observing the Company's technology integration and application programming interface, and providing feedback concerning operational and technological improvements. Migneco also had extensive access to L-1's customers and learned about implementation and management of Fingerprint Enrollment Services, including each customer's issues, useful and desired features, each customer's past needs and purchases, each customer's future plans, functionality of the enrollment centers, and information sharing between agencies. Migneco ultimately had program management responsibility for many of L-1's most important and valuable customers from New York to California.

19. The division of Idemia that provides Fingerprint Enrollment Services (and for which Migneco worked) was founded in, and operated out of, Nashville, Tennessee. In 2013, that division's office moved to Franklin, Tennessee. Since being hired in 2009, Migneco has always reported to, and had significant and regular contact with, the Tennessee offices. Prior to its

8

acquisition by Safran and the subsequent merger with the other of Safran's U.S.-based subsidiaries (as described above), L-1 was headquartered in Stamford, Connecticut, and certain aspects of Migneco's employment with L-1 were also administered from Connecticut. Migneco's employment continued unchanged through Safran's acquisition of L-1 and the merger of the U.S.-based entities, as well as through OT's subsequent acquisition of the Company. The only thing that changed was the name of the entity for which he worked which is now known as Idemia.

20. In 2012, Migneco expressed an interest in transitioning to a new role with Idemia so that he could progress in his career. Because of his exhaustive knowledge concerning Fingerprint Enrollment Services customers and technology, Migneco was deemed a good fit for the sales team for Fingerprint Enrollment Services. As a result, Migneco transitioned within Idemia from program management to a sales role for the division of Idemia offering Fingerprint Enrollment Services. In his new role as Director of Sales, Migneco was responsible for securing new contracts with U.S. state agencies for Fingerprint Enrollment Services. As part of these responsibilities, Migneco was entrusted with Idemia's confidential pricing models, including current customer pricing information and strategies. As part of the overall sales team, Migneco also had access to other confidential information, such as marketing and business plans and strategies, as well as sales and market data. Idemia expends significant resources on developing its plans and strategies, as well as compiling its data.

21. Migneco was a key member of Idemia's sales team that was charged with responding to RFPs for states that used that method to bid on contracts to provide Fingerprint Enrollment Services. As part of that team, Migneco worked extensively with members of Idemia's marketing, finance, and technical teams to plan Idemia's strategy and ultimately submit Idemia's proposals. His involvement in this process gave him access to a significant amount of Idemia's

confidential information, including information about its technology, its platforms, how Idemia positions its solutions in the RFP (including support, additional services, product capabilities, implementation, and training), and Idemia's organizational structure (including its third-party partners with which Idemia contracts to fulfill its contracts).

22. Migneco had access to Idemia's aggregated history of all bids Idemia has submitted for prior RFPs, whether ultimately awarded to the Company or not. He also had access to feedback from Idemia's debriefing sessions in instances where Idemia was not awarded the contract. This information is, in essence, a complete library of how and why Idemia did or did not succeed in the Fingerprint Enrollment Services industry. This information provided Migneco extremely valuable insight into Idemia's position and strategy in the market overall, information that is not known to members of the general public or Idemia's competitors.

23. Migneco not only had access to information about Idemia's *current* technologies, platforms, and solutions, but he also had access to information about Idemia's *future* technologies and strategies. As with any industry centered on rapidly developing and competitive technology, Idemia is continually innovating to provide its customers better services. Migneco has knowledge of specific technological innovations that Idemia will be rolling out to its customers in the coming years. Even when these innovations are in use, Idemia's competitors will not have knowledge of the underlying technology. In addition, Migneco has knowledge of specific marketing strategies for expanding business in certain states. This information will continue to give Idemia an advantage over its competitors in the years to come. If this information is provided to one of Idemia's competitors, it could allow them to short circuit the months and years of R&D and planning that is typically required to bring new solutions to market.

24. Migneco's knowledge concerning Idemia's technologies, platforms, and solutions could allow him to provide technical insight to Idemia's competitors, including Defendant Biometrics. Migneco's knowledge concerning Idemia's current customers, contracts, pricing models, and strategies would allow him to formulate bids for Biometrics (or any of Idemia's customers) that have a greater likelihood of succeeding. The relationships Migneco has developed with Idemia's customers' key decision-makers and operations personnel allow him to leverage Idemia's goodwill on behalf of Idemia's competitors. Therefore, this information and goodwill will allow Migneco to help competitors, including Defendant Biometrics, to compete directly and immediately with Idemia. The confidential information Idemia provided Migneco is not limited to his particular accounts, but is relevant nationally and potentially globally. Idemia's technology, platforms, and solutions have elements that are the same for all customers, and knowledge of one customer's program is able to be used for others customers' programs.

**Idemia Directly Competes with Biometrics in the Enrollment Services Market**

25. Migneco's employment with Idemia ended effective September 1, 2017. Migneco then started working as Vice President of Sales for Biometrics. Biometrics is a multi-biometrics technology company based out of California with a global presence. Biometrics is a direct competitor to Idemia in the enrollment services market, including by directly competing with Idemia for contracts with state agencies for Fingerprint Enrollment Services. On information and belief, Migneco's position for Biometrics is identical to his former position at Idemia – he is a senior member of Biometric's sales organization and assists Biometrics in competing for state contracts for Fingerprint Enrollment Services.

26. As outlined above, Migneco has special knowledge concerning Idemia's technologies, (including specific technological innovations) and customers (including specific business plans related to particular states). In his role with Biometrics, Migneco will be able to

11

provide technical insight and practical understanding to assist Biometrics in replicating Idemia's technology, platforms, and solutions to unfairly compete with Idemia. Biometrics will also be able leverage his knowledge and Idemia's goodwill to market to Idemia's existing customers. Because of the similarities between Idemia and Biometrics, particularly in the Fingerprint Enrollment Services industry, it is virtually certain that Migneco will disclose confidential information to Biometrics and use Idemia's goodwill on Biometrics' behalf.

27. On November 1-2, 2017, Migneco attended a meeting of the National Crime Prevention and Privacy Compact Council as a representative of Biometrics. The Compact Council is a body established to create rules and procedures for the effective use and sharing of criminal identification information for noncriminal justice purposes. Virtually all of the members of the Compact Council are Idemia's customers or prospective customers. Migneco was responsible for certain critical customers for Idemia who are also members of the Compact Council. Upon information and belief, the only reason for Migneco attending the meeting was to solicit customers, including Idemia's customers for which Migneco had responsibility while employed by Idemia, on behalf of Biometrics.

28. On November 15, 2017, Idemia's attorneys sent a letter to Migneco demanding that he cease and desist from any and all activity that violates his post-employment obligations to Idemia. The letter informed Migneco of his post-employment obligations to Idemia, including his noncompetition restrictions and his duty not to use or disclose Idemia's confidential information. On November 15, 2017, Idemia's attorneys also sent a copy of the letter to Migneco to Biometrics c/o Edward D. Chen, its Chief Executive Officer. Despite Idemia's notice to both Migneco and Biometrics, Migneco has continued his employment with Biometrics in direct breach of his obligations to Idemia pursuant to the Agreement. On December 11, 2017, Migneco's attorney sent

Idemia's attorney a letter indicating that Migneco would not resign or stop competing. To date, Biometrics has not responded.

29. Since that time, Migneco has taken increasingly competitive activities on behalf of Biometrics. For example, on information and belief, Migneco sent an email to customer contacts with whom he had developed relationships on Idemia's behalf while managing and selling enrollment services for Idemia announcing his new position with Biometrics. Upon information and belief, in deciding to whom to send the email, Migneco almost certainly used the confidential contact information he received while at Idemia.

30. Biometrics recently submitted a proposal in response to an RFP by the state of Colorado. While employed with Idemia, Migneco was responsible for Colorado and he is familiar with Idemia's strategy for pursuing that business. Prior to this, Biometrics had never submitted a proposal for an RFP which has similar requirements to Colorado. Based on information and belief and on this apparent change in Biometric's approach and strategy, it is likely that Migneco helped Biometrics to prepare and submit their proposal in direct competition with Idemia.

31. On January 24-26, 2018, Migneco attended a meeting of SEARCH on behalf of Biometrics. SEARCH, the National Consortium for Justice Information and Statistics, is an organization which supports the high-tech crime investigative, information sharing, communications interoperability, information technology, and criminal records systems needs of justice and public safety practitioners at the state, local, regional, and tribal levels nationwide. Its members include appointees from all 50 States, the District of Columbia, and the territories. SEARCH, along with the Compact Council, are the most important groups in the public Fingerprint Enrollment Services industry. Virtually all of the members of SEARCH are Idemia's customers or prospective customers. Migneco was responsible for certain critical customers for

13

Case 3:18-cv-00239   Document 1   Filed 02/26/18   Page 13 of 20 PageID #: 13

Idemia who are also members of SEARCH. While at the meeting, Migneco had significant contact with Idemia's customers and, upon information and belief, was soliciting those customers on Biometrics' behalf. Upon information and belief, the only reason that Migneco would have attended the meeting would be to solicit Idemia's customers on behalf of Biometrics in direct competition with Idemia.

32. Migneco's violation of the Agreement threatens Idemia with long-term injury that would be very difficult to quantify. The non-competition period is two years after Migneco's last day of work and ends on September 1, 2019. Between now and then, contracts with state agencies for Fingerprint Enrollment Services will be released that are together worth hundreds of millions of dollars. Proposals for a contract with Oklahoma are due on March 6, 2018, and the value of that contract for the first year will be approximately $5,000,000, with a potential overall value of approximately $35,000,000. Many of these contracts are also long in duration, lasting up to ten years, meaning that any competition will be costly and may not be immediately apparent. Because of the difficulties in determining the precise reasons why one company is awarded a contract over another company, it would be very difficult to determine the actual amount of losses that would result from Migneco's breach. In addition, many states consider a company's past performance when awarding contracts, so if Biometrics is awarded a contract, it may have a residual advantage when submitting future proposals. Idemia's losses of opportunities and the goodwill associated with its relationship with its customers could continue for many years after the Agreement expires.

33. It would not be unduly burdensome to require Migneco to honor the terms of his contract with Idemia. The Agreement is narrowly tailored and contains reasonable and enforceable restrictions based on the two year duration and a narrow set of competitors. It will take at least two years to ensure that Migneco's knowledge of Idemia's technologies, platforms, solutions,

customers, pricing information, and other business information is no longer current or accurate. In addition, Migneco could work in a sales capacity for virtually any business outside of the Fingerprint Enrollment Services industry, including his prior industry, car auctions. Many of the skills Migneco has honed in his management and sales career are readily transferable to other industries, including other technology companies that have similar, but non-competing, technologies and services.

## CAUSES OF ACTION

### COUNT ONE
*Breach of Contract Against Migneco*

34. Idemia realleges all and singular paragraphs 1 through 32 as though fully set forth herein.

35. Idemia and Migneco are parties to the Agreement.

36. All conditions precedent under the Agreement have occurred.

37. The Agreement is supported by consideration.

38. The Agreement is reasonable and enforceable, and is necessary to protect Idemia's legitimate business interests in, among other things, its confidential information and customer goodwill.

39. Migneco is in breach of the Agreement, including, without limitation, Section (7), by virtue of his employment with and retention by Biometrics.

40. Idemia lacks an adequate remedy at law for Migneco's breaches of the Agreement, and Idemia requires specific performance in the form of injunctive relief to prevent irreparable injury.

41. By virtue of the foregoing, Idemia is entitled to injunctive relief restraining Migneco from being employed by or performing services for Biometrics for two years following the termination of his Idemia employment, and damages in an amount to be proven at trial.

## COUNT TWO
### *Declaratory and Injunctive Relief Against Migneco*

42. Idemia realleges all and singular paragraphs 1 through 40 as though fully set forth herein.

43. There is a ripe and justiciable controversy between Idemia and Migneco.

44. Idemia is entitled to a declaration that the Agreement precludes Migneco from being employed by or performing services for Biometrics for two years following the termination of his Idemia employment.

45. Idemia lacks an adequate remedy at law for Migneco's breaches of the Agreement, which threatens Idemia with irreparable harm, including the misappropriation of its confidential information, loss of significant business, and injury to its customer goodwill.

46. By virtue of the foregoing, Idemia is entitled to injunctive relief restraining Migneco from being employed by or performing services for Biometrics for two years following the termination of his Idemia employment.

## COUNT THREE
### *Declaratory and Injunctive Relief Against Biometrics*

47. Idemia realleges all and singular paragraphs 1 through 45 as though fully set forth herein.

48. There is a ripe and justiciable controversy between Idemia and Biometrics.

49. Idemia is entitled to a declaration that the Agreement precludes Biometrics from employing or receiving services from Migneco for two years following the termination of his Idemia employment.

50. Idemia lacks an adequate remedy at law for Migneco's breaches of the Agreement, which threatens Idemia with irreparable harm, including the misappropriation of its confidential information, loss of significant business, and injury to its customer goodwill.

51. By virtue of the foregoing, Idemia is entitled to injunctive relief restraining Biometrics from employing or receiving services from Migneco for two years following the termination of his Idemia employment.

## COUNT FOUR
*Tortious Interference With Contract Against Biometrics*

52. Idemia realleges all and singular paragraphs 1 through 50 as though fully set forth herein.

53. The Agreement is a valid and enforceable contract.

54. At all relevant times, Biometrics has had actual or constructive knowledge of the Agreement.

55. Biometrics has intentionally induced Migneco's breach of the Agreement by employing and retaining him in violation of the Agreement.

56. Biometrics acted with malice because it willfully violated Idemia's rights.

57. Despite due demand, Biometrics has failed and refused to cease and desist from employing and retaining Migneco in breach of his Agreement, and Biometrics continues to employ and retain Migneco.

58. Biometric's tortious interference with the Agreement has caused and will continue to cause Idemia injury, including without limitation attorneys' fees and other expenses incurred as a result of being thrust into litigation with Migneco to protect its contractual rights and loss of significant business.

59. By reason of the foregoing, Idemia is entitled to recover treble damages pursuant to Tenn. Code Ann. § 47–50–109 in an amount to be proven at trial.

## COUNT FIVE
### *Violation of Tennessee Uniform Trade Secrets Act (Tenn. Code Ann. § 47-25-1701, et seq.)*
### *Against Migneco and Biometrics*

60. Idemia realleges all and singular paragraphs 1 through 58 as though fully set forth herein.

61. Idemia holds valuable trade secrets related to Fingerprint Enrollment Services including its underlying technologies, how it positions its solutions, its customers, its pricing models and strategies, its customers' particular needs, the terms of the contracts with its customers, and other business information as described above. These trade secrets derive independent economic value from not being generally known to, and readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

62. Idemia has taken efforts that are reasonable to maintain the secrecy of its trade secret information.

63. By accepting employment as the Vice President of Sales for Biometrics, and performing the duties thereof, Migneco and/or Biometrics threaten misappropriation of Idemia's trade secrets because Migneco's job duties for Biometrics will require him to work on and/or supervise the sale of technologies, platforms, solutions, and services that compete, or will compete, with Idemia's technologies, platforms, solutions, and services as to which Migneco knows Idemia's trade secrets, and Migneco will not be able to refrain from using for the benefit of Biometrics such Idemia trade secrets.

64. By virtue of the foregoing, Idemia is entitled to temporary and permanent injunctive relief pursuant to Tenn. Code Ann. § 47-25-1703 restraining Migneco from being employed by or performing services for Biometrics.

65. Idemia is also entitled to damages pursuant to Tenn. Code Ann. § 47-25-1704, to the extent that it is determined that any actual misappropriation of Idemia trade secrets by Migneco and/or Biometrics occurred before, or after, an injunction issues.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Idemia Identity & Security USA LLC prays for a judgment in its favor and against Defendants Joseph Migneco and Biometrics4ALL, Inc. as follows:

i. Declaring that any employment of Migneco by Biometrics or any performance of services by Migneco for Biometrics prior to September 1, 2019, are breaches of the Agreement.

ii. Temporarily and permanently enjoining Migneco from being employed by or directly or indirectly performing services for Biometrics until September 1, 2019.

iii. Temporarily and permanently enjoining and restraining Biometrics and its heirs, successors, agents, assigns, and employees, and all persons in active concert or participation with them who receive actual notice of the Court's order, from employing Migneco in any capacity or receiving services from Migneco of any sort that violates the Agreement until September 1, 2019.

iv. Awarding Idemia damages against Defendants in an amount to be proven at trial, including treble damages against Biometrics pursuant to Tenn. Code Ann. § 47–50–109.

v. Awarding Idemia interest, costs, and disbursements herein.

vi. Awarding Idemia such other, further, or different relief as the Court may deem just and equitable.

Dated: February 26, 2018

Respectfully submitted,

/s/ Mark Hunt
Mark E. Hunt, BPR 10501

Christopher J. Barrett, BPR 32978
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN  37201
(615) 259-3456
Email:  mhunt@kingballow.com
           cbarrett@kingballow.com

**ATTORNEYS FOR PLAINTIFF IDEMIA IDENTITY & SECURITY USA LLC**